UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————X

BERNADETTE WOLKEN,

               Plaintiff,              **MEMORANDUM & ORDER**

   v.

                                   **24-CV-8154 (LKE)**

FRANK BISIGNANO[1], Commissioner of
Social Security,

               Defendant.

——————————————————————X

**LARA K. ESHKENAZI**, United States Magistrate Judge:

    Plaintiff Bernadette Wolken ("Plaintiff") seeks review of the Commissioner of the Social Security Administration's ("Commissioner" or "Defendant") denial of her application for Social Security Disability Insurance benefits under Title II of the Social Security Act. (Compl., ECF 1.) Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (ECFs 6, 9.) For the following reasons, Plaintiff's motion is denied, and the Commissioner's motion is granted.

## I.    BACKGROUND

### A.    Procedural History

    Plaintiff applied for Social Security Disability Insurance benefits on July 25, 2017, alleging disability as of October 8, 2015. (Tr. 71 (showing date of filing), 247 (showing date of diagnosis);

---

[1] Frank Bisignano became the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Bisignano is substituted for Martin O'Malley, former Commissioner of Social Security, as the defendant in this suit. See 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

*see also* Def. Br. at 1, ECF 9-1.)[2] She premised her claim of disability on lymphedema, fatigue, pain, anxiety, and memory issues stemming from her diagnosis with and treatment for invasive ductal carcinoma of the left breast. (Tr. 37-38, 40-42, 50, 52-53.) Administrative Law Judge ("ALJ") Robert R. Schriver initially denied her claim, Plaintiff appealed, and the Appeals Council denied review. (Tr. 1-7.) Plaintiff then commenced her previous action pursuant to 45 U.S.C. § 405(g). (Tr. 14-28, 753-54.) The Honorable Rachel P. Kovner remanded the matter to the Appeals Council for further proceedings on May 17, 2023. (Tr. 755, 951-62.)

On remand, the Appeals Council issued an order vacating the prior decision and directing the ALJ to offer Plaintiff the opportunity for a hearing, address the additional evidence submitted, take any action needed to complete the administrative record, and issue a new decision. (Tr. 758.) Plaintiff and her attorney appeared before the ALJ for a hearing on August 12, 2024, and on September 25, 2024, the ALJ again issued a decision finding Plaintiff not disabled. (Tr. 685-705.) Plaintiff appealed that decision to this Court on November 25, 2024, pursuant to 45 U.S.C. § 405(g). (ECF 1.)

### B.    Administrative Record

#### 1.    Non-Medical Evidence

Plaintiff was born in 1965, and while she did not complete high school or obtain a GED, she found work in the food service industry until becoming disabled at age 50. (Tr. 131, 162-64, 713-14.) Plaintiff experienced gaps in her employment due to time spent raising her children but continued working until being laid off in 2011. (Tr. 132, 162.) At the time of the first hearing, she

---

[2] The Commissioner filed the administrative transcript of the proceedings before the Social Security Administration at ECF 5. All references to ECF 5 are denoted as "Tr.___," referring to the page number displayed in the administrative transcript.

lived with her husband and adult son, both of whom worked full time, and her school-aged daughter. (Tr. 39-40.)

In 2017, prior to the first hearing, Plaintiff submitted an Adult Function Report indicating that her daily activities differed based on the fluctuating level of pain she experienced from day to day. (Tr. 169.) Plaintiff stated that she had limited use of her left arm and hands due to numbness, causing her to be unable to lift pots and pans and prepare more than simple meals without assistance from her mother. (Tr. 171-72.) Her conditions rendered her unable to drive or shop on her own, although she sometimes went shopping with her husband or mother. (Tr. 172.) She spent her days reading and watching television, although she needed to change position at least every two hours while sitting to avoid clotting due to a blood condition. (Tr. 171-73.) She handled her own financial matters, did not require help or reminders to take her medicine, and did not have trouble with her memory despite daily pain and medications taken to manage her pain. (Tr. 169-73, 175-78.)

Plaintiff reported that she must nap daily, did not go out alone, did not do any lifting, and could not stand for long periods. (Tr. 174.) Plaintiff avoids stairs and must rest after she uses them, is limited in her ability to reach and use her hands, is unable to kneel or squat, and must stop to rest after walking two or more blocks. (Tr. 174-75.) Plaintiff reported in response to the Questions About Pain section of her September 2017 Adult Function Report questionnaire that she began to have neuropathy after chemotherapy and radiation treatments. (Tr. 176.) She also experiences chest pain from her incision, as well as pain in her feet, fingers, back, and legs, all of which she attributed to Letrozole medication side effects. (Tr. 177.)

At the November 19, 2018, hearing before the ALJ, Plaintiff confirmed that she was diagnosed with breast cancer in October 2015, necessitating a mastectomy, reconstructive surgery,

and ongoing physical, occupational, and psychological treatments. (Tr. 37-38, 42.) Plaintiff confirmed that her mother and husband handle most of the family's cooking and cleaning and stated that her mother does any lifting associated with laundry. (Tr. 46-47.) Plaintiff said that she must wear compression garments due to lymphedema, which limits her mobility on her left side. (Tr. 40-41.) She said that she suffered memory loss and fatigue following chemotherapy and radiation and said that she can only sit for up to an hour and a half before experiencing radiating back and leg pain. (Tr. 41, 43.) Plaintiff further stated that she cannot lift weight heavier than a gallon of milk, roughly eight pounds, and that she can stand for no more than fifteen to twenty minutes and walk only two to three blocks. (Tr. 43-44.)

At the same 2018 hearing, Plaintiff noted that she woke up several times each night due to pain and as a result must nap twice a day for up to two hours at a time. (Tr. 47.) She stated that she has been treated by a therapist for her anxiety since 2016 and that she began taking medications for her anxiety about a year before the hearing. (Tr. 50-51.)

At her next hearing[3], roughly six years later, Plaintiff confirmed that she was being treated for lymphedema and wore a compression sleeve on her left arm, had dropped out of school after tenth grade, and that her daily activities were limited by her conditions to light cleaning, with no cooking or laundry. (Tr. 712-15.) Plaintiff explained that she could not push or lift items out of a shopping cart. (Tr. 716.) Plaintiff noted that, although she could move her left arm, any lifting could lead to swelling, and said that she suffered from pain every day. (Tr. 717-18.) She said that she could only sit for an hour at a time before needing to move, could only stand for thirty minutes at a time, and could not walk more than half a block before needing to sit and rest. (Tr. 717.)

---

[3] Defendant asserts that, at Plaintiff's August 12, 2024, hearing, she testified only to her current functioning. (Def. Br. at 3-4.) Plaintiff counters that, although the questioning and answers given at the 2024 hearing were in the present tense, "all questions were referring to the period prior to [Plaintiff's] date last insured." (Pl. Br. at 5, ECF 7.) The Court includes the facts presented at the 2024 hearing for completeness.

4

Plaintiff estimated that she could lift items up to ten pounds with her right hand and said that she could not lift anything with her left hand. (Tr. 717.) She noted that her fine motor function is limited, including by being unable to type at a keyboard or text without the use of a pencil. (Tr. 718-19.)

Plaintiff further stated that when she uses a cane for shopping, only drives locally, and has trouble sleeping through the night due to anxiety. (Tr. 719-21.) She testified that she naps during the day because she feels foggy and lacks energy, and that she continues to experience memory issues since completing chemotherapy treatment. (Tr. 720-21.) Plaintiff stated that her anxiety was severe enough to limit interactions with friends and family, and said that she would be unable to perform even sedentary work due to her anxiety and inability to remain seated for long periods of time. (Tr. 721-24.)

Vocational witness Andrew Vaughn appeared at the second hearing. (Tr. 724.) The ALJ posed two hypotheticals to him, the second with increasing limitations. (Tr. 725-26.) The most limited hypothetical included the limitations in the residual functional capacity ("RFC") found in the decision. (Tr. 725-26.) Mr. Vaughn testified that an individual with Plaintiff's vocational profile and functional limitations as incorporated into the RFC finding could perform unskilled light work including such jobs as mail clerk or assembler. (Tr. 725-26.)

### 2. Medical Evidence

#### a. Treatment Notes

Plaintiff was diagnosed with Stage II breast cancer on October 8, 2015. (Tr. 247.) Her cancer was confirmed by a biopsy on October 18, 2015, prior to Plaintiff's date last insured ("DLI") of December 31, 2016. (Tr. 325-26.) Plaintiff endured a total mastectomy of her left breast and an axillary lymph node dissection on November 12, 2015, after which she underwent four

5

rounds of chemotherapy by March 23, 2016, followed by twelve weeks of radiation beginning on April 6, 2016. (Tr. 332-36, 247, 281-82, 309-14, 612-14, 651.) As Plaintiff was receiving chemotherapy and radiation, she also went through a series of tissue expansions to prepare for a prosthesis which was implanted by Dr. Babak Mehrara on February 16, 2017. (Tr. 342-55, 361-62.) Plaintiff's prosthesis was then revised by Dr. Mehrara in November of 2017. (Tr. 606-07.)

Treatment notes indicate that in April 2016, during the course of her cancer therapy, Plaintiff developed a pulmonary embolism. (Tr. 237.) Plaintiff's pulmonary embolism revealed that Plaintiff has Factor V Leiden, a blood disorder that increases the risk of clotting. (Tr. 227-30.) As a result, Plaintiff took a blood thinner for four months ending in October 2016. (Tr. 239.) At her oncology appointment with Dr. Rufus Collea in December of 2016, Plaintiff was reported to be "quite well," had a recent negative mammogram with no signs of disease recurrence, and had tolerated hormone therapy "without difficulty." (Tr. 233-34.) Plaintiff reported no substantial side effects and no residual symptoms from chemotherapy at that time, and indicated that she was walking up to one mile per day. (Tr. 233.)

After the conclusion of her radiation therapy, Plaintiff was prescribed Letrozole. (Tr. 1327.) Dr. Mehara, the plastic surgeon who performed Plaintiff's reconstruction, noted in February 2018 that Plaintiff had developed lymphedema with resulting functional limitations since the procedures and required therapy and compression garments, but did not specify an onset date for either the condition or treatment. (Tr. 29, 495-96, 1013.) Plaintiff's records also indicate that physical therapy was prescribed for lymphedema-induced reduced mobility and "drug induced polyneuropathy" after Plaintiff's DLI, but do not indicate when she first complained of the neuropathy outside of a note from Plaintiff's hematologist-oncologist in August 2017 describing it as "recently diagnosed." (Tr. 389, 505.)

6

Regarding Plaintiff's psychological conditions, Plaintiff noted anxiety regarding her cancer diagnosis as early as December 23, 2015. (Tr. 305.) In February of 2016, Plaintiff reported to Dr. Gregorio Calleja, her primary care physician, that her anxiety was stable with Klonopin but did not mention her symptoms, her limitations, or when she began taking Klonopin. (Tr. 449-50.) In July 2016, Dr. Calleja renewed Plaintiff's Klonopin prescription. (Tr. 450.) While her anxiety was "better" in September 2016, Dr. Calleja recorded Plaintiff's depression as "stable." (Tr. 451.) By December of 2016, Dr. Calleja prescribed Plaintiff Zoloft, an anti-depressant, to treat reported crying, insomnia, and overeating in response to issues at home and concerns regarding her upcoming surgeries. (Tr. 452.)

From December 2016 to January 2017, Plaintiff received psychotherapy at ECS Psychological Services ("ECS Psychological") for a diagnosis of "depressive disorder due to another medical condition," likely Plaintiff's breast cancer. (*See* Tr. 218-26.) The last treatment note, from January 2017, reported that Plaintiff's psychotherapist would "reassess" further treatment after Plaintiff's February 2017 surgery. (Tr. 220.) Despite Plaintiff's symptoms and complaints, her therapist at ECS Psychological recorded normal mental status exam results at each visit. (Tr. 218-26.) The attending psychologist at Sloan-Kettering, Dr. Doolittle, noted that Plaintiff had been treated at the Department of Psychology since November 23, 2015. (Tr. 13, 1014.) He detailed her symptoms in a report dated February 26, 2019, submitted to the Appeals Counsel after Plaintiff's first hearing and then submitted as an exhibit prior to the second hearing. (Tr. 13, 1014.) The next treatment note to reference Plaintiff's psychological issues is not until June 19, 2018, at which point Plaintiff reported to Dr. Melissa Ozga, a psychiatrist, that her primary concerns were trouble coping, lack of motivation, an inability to experience pleasure, and anxiety. (Tr. 586-88.)

In July of 2018, Plaintiff's main complaint remained difficulty coping, although at this follow-up with Dr. Ozga, Plaintiff denied any anxiety or mood disturbance. (Tr. 638-39.) At her next follow-up with Dr. Doolittle, on August 16, 2018, Plaintiff said that she experienced depressed moods three to four days per week and had for the past year, along with other symptoms. (Tr. 589-90.)

### b.    Opinion Evidence

Dr. Doolittle completed a Mental Impairment Medical Source Statement for Plaintiff in July 2024. (Tr. 1243.) In it, he opined that, although he had first treated Plaintiff in 2018, after the DLI, he believed that it was "likely" her conditions had existed at the levels described since at least November 12, 2015. (Tr. 1243.) Dr. Doolittle's clinical findings concluded with a diagnosis of panic disorder and major depression. (Tr. 1240.) He opined that Plaintiff's mental abilities were unsatisfactory or worse in several categories needed to perform unskilled work, causing deficiencies in concentration, persistence or pace and repeated episodes of "deterioration" or "decompensation" in work or work-like settings. (Tr. 1241-43.) Despite these findings, Dr. Doolittle also opined that Plaintiff had no limitations in activities of daily living or social functioning. (Tr. 1241-43.) Ultimately, he opined that Plaintiff's conditions and symptoms would cause her to be absent from work three or more times each month, and noted that the activities and deadlines inherent in a workplace "are likely to trigger panic responses and return to severe social withdrawal." (Tr. 1241-43.)

State psychological consultant A. Chapman reviewed Plaintiff's file on October 16, 2017, and found insufficient evidence to establish a medically determinable mental impairment prior to December 31, 2016, Plaintiff's DLI. (Tr. 68.)

In a February 16, 2018, letter, after Plaintiff's November 2017 breast reconstruction revision, Dr. Mehara noted that Plaintiff had since "developed left upper extremity and torso lymphedema." (Tr. 487, 1013.) Dr. Mehara explained Plaintiff's treatment of her lymphedema, including therapy and compression garments. (Tr. 487.) In a subsequent November 2018 letter, Dr. Mehara explained that Plaintiff had swelling of her upper left arm area, noted that she was seeing a lymphedema therapist, and explained that Plaintiff's lymphedema was a permanent condition that would require therapy and compression garments. (Tr. 1013.)

## II.   <u>LEGAL STANDARD</u>

A district court reviewing a final decision of the Commissioner is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* Fed. R. Civ. P. 12(c) (allowing courts to enter a judgment on the pleadings). Federal judicial review, however, is "limited." *Rubin v. Comm'r of Soc. Sec.*, 116 F.4th 145, 154 (2d Cir. 2024). Reviewing courts "do not substitute" their own "judgment for the agency's" or review the record de novo. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). Instead, "[w]e conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Rubin*, 116 F.4th at 154.

In conducting this review, courts must determine (1) "whether the correct legal standards were applied," and (2) "whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Rucker v. Kijakazi*, 48 F.4th 86, 90-91 (2d Cir. 2022). Whether the record contains "substantial evidence" depends on whether "a reasonable mind might accept" the evidence "as adequate to

support" the ALJ's determination. *Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (explaining that "[t]he phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding"). The "threshold for such evidentiary sufficiency is not high;" it requires only that the record contain "more than a mere scintilla" of evidence. *Id.* at 103. The court must uphold the Commissioner's conclusion so long as it is supported by a "rational interpretation" of the evidence. *Rubin*, 116 F.4th at 155. However, courts must still "examine contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (cleaned up).

"Before determining whether the Commissioner's final decision is supported by substantial evidence[,] the court must first be satisfied that the ALJ completely developed the administrative record." *Kelly v. Comm'r of Soc. Sec.*, No. 20-cv-05318 (JS), 2024 WL 5120051, at *9 (E.D.N.Y. Dec. 16, 2024). The ALJ has a "well-established" obligation to investigate and develop the record, even where a claimant is counseled—this "has been described as a bedrock principle of Social Security law." *Id.* (internal quotation and citation omitted). Accordingly, where the presiding ALJ did not apply the correct legal standard or sufficiently develop the record, a court may remand the case for further proceedings. *See Sczepanski v. Saul*, 946 F.3d 152, 162 (2d Cir. 2020); *Daniels v. Kijakazi*, 617 F. Supp. 3d 180, 195 (S.D.N.Y. 2022).

The Social Security Administration distributes social security disability insurance benefits to eligible applicants pursuant to the Social Security Act. *See generally* 42 U.S.C. § 301 *et seq*. To secure benefits, an applicant must demonstrate, among other things, that they are disabled: that their impairment or combination of impairments render the applicant unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner, acting via a presiding ALJ, assesses whether an applicant meets the statutory definition of disabled by undertaking a "five-step sequential evaluation process." 20 C.F.R. § 404.1520(a)(4). The Commissioner only advances to the next step where a determination of an applicant's disability status cannot be made at that stage. *Id.*

The first step is to evaluate the applicant's work activity; a disability determination will be denied where an applicant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). At the second step, the Commissioner "considers the medical severity of the claimant's impairment or combined impairments." *Rubin*, 116 F.4th at 147 (citing 20 C.F.R. § 404.1520(a)(4)(ii)). The third step is a determination of whether the applicant's impairment "meets or equals" one of the listings in Appendix 1 of Part 404, Subpart P ("Listed Impairment"). 20 C.F.R. § 404.1520(a)(4)(iii). If the applicant's impairments do not meet or equal a Listed Impairment, the Commissioner determines the claimant's RFC, which is the claimant's ability to function in a workplace despite medical limitations and "based on all the relevant medical and other evidence in [the] case record." *Id.* § 404.1520(e). At step four, the Commissioner assesses whether the claimant can perform past relevant work when considering the claimant's RFC. *Id.* § 404.1520(a)(4)(iv).

If the claimant cannot perform their past relevant work, the fifth and final step is to consider whether an applicant, given their RFC, age, education, and work experience, can perform other work. *Id.* § 404.1520(a)(4)(v). The claimant "bears the burden of proof in the first four steps of the sequential inquiry." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). However, at step five, "the burden shifts, to a limited extent, to the Commissioner to show that other work exists in significant numbers in the national economy that the claimant can do." *Rubin*, 116 F.4th at 148.

### III.    DISCUSSION

#### A.    The ALJ's Determination

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the period of her alleged onset date, October 8, 2015, through her DLI, December 31, 2016. (Tr. 690.) At step two, the ALJ found that Plaintiff suffered from six medically severe impairments: invasive ductal carcinoma of the breast, status post-mastectomy, chemotherapy, and reconstructive surgery; Factor V Leiden heterozygosity; status post-pulmonary embolism; anemia; depressive disorder; and panic disorder. (Tr. 690-91.) Specifically, the ALJ determined that these impairments "constitute more than slight abnormalities and significantly limit the ability to perform basic work activities as required by SSR 85-28." (Tr. 691.)

At step three, the ALJ concluded that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity" of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 691); *see also* 20 CFR §§ 404.1520(d), 404.1525, and 404.1526. The ALJ noted that there was no evidence indicating that Plaintiff's cancer was either locally advanced, metastasized, recurrent, or small-cell, and there was no evidence prior to the DLI of Plaintiff's lymphedema. (Tr. 691.) The ALJ spent a significant portion of his decision on Plaintiff's mental health impairments, concluding that "singly and in combination, [her impairments] did not meet or medically equal the criteria of listings 12.04 and 12.06." (Tr. 691.) The ALJ reasoned that, because "the claimant's mental impairments did not cause at least two 'marked' limitations or one 'extreme' limitation," paragraph B's criteria were not met. (Tr. 692.) Similarly, because "[t]he record does not establish that the claimant has only…a minimal capacity to adapt to changes in [her] environment or to demands that are not already a

12

part of [her] daily life[,]" Plaintiff's symptoms do not meet the requirements of paragraph C. (Tr. 692.)

The ALJ then assessed Plaintiff's RFC, finding that she had the RFC "to perform light work as defined in 20 C.F.R 404.1567(b), except that she must avoid concentrated exposure to respiratory irritants" and limit herself to simple tasks, make "only simple work-related decisions[,] and have[] only occasional interaction with supervisors, coworkers, and the general public." (Tr. 692.) In making this decision, the ALJ first considered "whether there is an underlying medically determinable physical or mental impairment(s)," meaning an impairment that could be shown by medically acceptable clinical or laboratory diagnostic techniques, which could "reasonably be expected to produce the claimant's pain or other symptoms." (Tr. 693.) Once such a limitation has been shown, the ALJ then evaluates the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." (Tr. 693.) The ALJ first determined that Plaintiff's "medically determinable impairments[,]" including Plaintiff's Factor V blood disorder, side effects from breast cancer treatment, and depression, "could reasonably be expected to cause the alleged symptoms." (Tr. 693.) The ALJ next found, however, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 693.) For example, the ALJ noted that the Plaintiff "suffers from multiple physical and or psychiatric impairments [] which could reasonably be expected to interfere with her abilities to do more than unskilled light level lifting or carrying or to engage in prolonged standing and walking," as well as require that she "avoid certain environmental conditions that might exacerbate her symptoms post-chemotherapy and radiation." (Tr. 695.) The ALJ found that the overall record, however, "reflects no more than moderate

findings, fairly controlled and stable symptoms…and simply does not contain evidence consistent with the extensive degree of reduced functioning alleged by the claimant during the relevant time period." (Tr. 695-96.)

The ALJ reasoned that the evidence, taken in the light most favorable to Plaintiff, supports that she can perform at the RFC found by the ALJ despite the inconsistencies in the record regarding her functional limitations. (Tr. 696.) Specifically, the ALJ noted that "the record reflects that despite [her conditions] and the claimant's allegations that she cannot work, the claimant is capable of performing tasks consistent with the [RFC]." (Tr. 696.) While the ALJ acknowledged Plaintiff's diagnoses and complaints of pain, depression, anxiety, and difficulty getting along with others, the ALJ had based the RFC on Plaintiff's allegations and testimony along with "the longitudinal medical evidence of the record." (Tr. 696.)

At step four, the ALJ concluded that Plaintiff had no past relevant work. (Tr. 696.) At step five, the ALJ found that through the DLI, "considering the claimant's age, education, work experience, and [RFC]," there were jobs in significant numbers in the national economy that Plaintiff could have performed. (Tr. 696.) Relying on the testimony of the vocational expert, the ALJ determined that Plaintiff could perform jobs such as Dealer-Accounts Investigator, Nonpostal Mail Clerk, or Assembler. (Tr. 697.) As such, the ALJ reasoned that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from October 8, 2015, the alleged onset date, through December 31, 2016, the [DLI]." (Tr. 697 (citing 20 C.F.R § 404.1520(g)).)

## B.    Analysis

Plaintiff appeals the ALJ's decision on several grounds. First, Plaintiff argues that, though the ALJ did "to some degree" develop the record on Plaintiff's mental impairments, he did not "totally address" the gaps in the record on this issue. (Pl. Br. at 12.) Plaintiff next argues that the

ALJ failed to follow the orders of both the Appeals Council and the Court to assess the errors alleged by Plaintiff in her previous brief. (*Id.* at 11.) Specifically, Plaintiff argues that Judge Kovner directed the ALJ to "address the other claims of error that are raised by plaintiff in this case" in addition to dealing with the issue of Plaintiff's mental impairments. (*Id.* at 12 (citing Tr. 961).) Plaintiff's claims of error include: (1) that the RFC found is an improper medical conclusion by the ALJ; (2) that the ALJ failed to assess the lymphedema from which Plaintiff suffers; (3) and that the ALJ failed to consider the side effects of Plaintiff's medication. (*Id.* at 12.) Finally, Plaintiff argues that the ALJ's opinion lacks sufficient articulation. (*Id.* at 22.)

Defendant contends that Plaintiff's arguments related to the ALJ's compliance with the remand order pertain instead to the sufficiency of the evidence. (Def. Br. at 19.) This Court agrees and will review them as such. The Court now addresses each argument in turn.

### 1.    The ALJ's Development of the Record as to Plaintiff's Mental Impairment

"[T]he ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). This duty "arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination[.]" *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)–(f) (1995)); *see also Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018) (summary order) ("The social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." (cleaned up)). Although this duty is heightened when a claimant proceeds pro se, it "exists even when, as here, the claimant is represented by counsel." *Pratts*, 94 F.3d at 37. While it is true that the "affirmative duty to expand the record does not extend ad infinitum," reasonable efforts must

15

be made "to seek out further information where evidentiary gaps exist, or where the evidence is inconsistent or contradictory." *Cadet v. Colvin*, 121 F. Supp. 3d 317, 320 (W.D.N.Y. 2015).

Plaintiff contends that the ALJ did not resolve "clear gaps in the record" and inconsistencies related to Plaintiff's psychological conditions. (Pl. Br. at 11 (citing Tr. 959-61).) Plaintiff concedes that the ALJ addressed Plaintiff's mental impairment "to a point" by adding two severe impairments at step two and a line to the RFC stating that Plaintiff "is further limited to simple tasks only; making only simple work-related decisions; and having only occasional interaction with supervisors, coworkers, and the general public." (*Id.* at 12 (citing Tr. 692, Finding 5), 15.) She asserts, however, that the ALJ made no effort to determine if Plaintiff underwent psychological treatment prior to the DLI outside of the currently-known treatment, either by questioning Plaintiff at the hearings, by asking Plaintiff's treating physicians, or by "enlisting the assistance of administrative counsel." (*Id.* at 15-16.) Plaintiff further contends that the ALJ should have contacted Dr. Doolittle to obtain his retrospective opinions, both on Plaintiff's mental health prior to her DLI and her lymphedema diagnosis. (*Id.* at 13-14, 16.)

In response, Defendant argues that the ALJ sufficiently developed the record with regard to Plaintiff's mental impairments upon remand, finding at step two that Plaintiff suffered from severe mental impairments of depressive disorder and panic disorder. (Def. Br. at 16 (citing Tr. 691, 1023-35, 1041-51, 1057-59, 1061-63, 1117-47, 1014, 1240-43).) Further, Defendant points out that, after finding that Plaintiff had moderate limitations in her interactions with others and maintaining her concentration, persistence, or pace, the ALJ revised the RFC by adding a line further restricting Plaintiff's RFC to simple tasks and simple work-related decisions, with only occasional contact with others. (*Id.* at 16 (citing Tr. 691-92).) In response to Plaintiff's assertion that her prescription for psychotropic mediation from her primary care provider prior to her DLI

16

indicates that there is a "distinct possibility" that additional records exist that should have been sought by the ALJ, Defendant counters that receiving medication from her primary care physician indicates that Plaintiff was not being treated by a psychiatric specialist at the time. (*Id.* at 16-17.) Defendant also notes that Plaintiff never provided any such records, including after the ALJ agreed to hold the record open for two additional weeks for Plaintiff to submit any outstanding records. (*Id.* at 17.) Finally, Defendant asserts that it was unnecessary for the ALJ to contact Dr. Doolittle to clarify his 2024 opinion because, even if he had stated that his opinion dated back to the period at issue, the ALJ had a reasonable basis to find the opinion less persuasive because it was inconsistent with Plaintiff's treatment history during the relevant period. (*Id.* at 18 (citing 20 C.F.R. § 404.1520c(c)(2)).)

The Court agrees with Defendant that the ALJ satisfied his duty to develop the record. First, upon remand, the ALJ collected significant information regarding Plaintiff's mental condition during the period at issue. (*See, e.g.*, Tr. 691, 1023-35, 1041-51, 1057-59, 1061-63, 1117-47, 1014, 1240-43.) This additional information resulted in the ALJ including Plaintiff's depressive disorder and panic disorder in her severe impairments. (Tr. 691.) Moreover, Plaintiff had ample opportunity to submit any additional mental health records during the two-week extension granted by the ALJ for her to do so. (Tr. 711-12.) Plaintiff either chose not to, or could not do so because they did not exist. "It is not unreasonable to require the claimant, who is in a better position to provide information about [her] own medical condition, to do so." *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

Plaintiff's contention that the ALJ should have contacted Dr. Doolittle for additional information about his retrospective opinion is unpersuasive. There is no evidence in the record to suggest that Dr. Doolittle would have had a strong understanding or opinion about the status of

17

Plaintiff's mental health more than two years prior to beginning his treatment of her. And even if Dr. Doolittle had relevant information to give, where there are no "obvious gaps" in the record and the ALJ possesses a complete medical history, the ALJ is under no obligation to seek a treating-source opinion. *David B.C. v. Comm'r of Soc. Sec.*, No. 20-cv-1136, 2021 WL 5769567, at *7 (N.D.N.Y. Dec. 6, 2021).

For the foregoing reasons, this Court finds that the ALJ fulfilled his duty to develop the record.

### 2.    Substantial Evidence Analysis

As noted above, the Court reviews the ALJ's decision to determine only (1) "whether the correct legal standards were applied," and (2) "whether substantial evidence supports the decision." *Butts*, 388 F.3d at 384; *see also Rucker*, 48 F.4th at 90-91. Neither party appears to assert that the ALJ did not apply the correct standards of law. Accordingly, the Court now addresses whether the ALJ's decision is supported by substantial evidence.

As an initial matter, as discussed above, the Court finds that the ALJ sufficiently complied with the remand instructions he received to develop the record on Plaintiff's mental impairments. To the extent Plaintiff argues that the ALJ failed to address several additional "claims of error" on remand, (Pl. Br. at 11), the Court disagrees.

First, Plaintiff's assertion that the ALJ's RFC finding constituted an improper medical determination is premised on her contention that the ALJ did not rely on a medical opinion. (*See* Pl. Br. at 17.) However, as Defendant aptly notes, "[n]othing in the regulation indicates that an ALJ's ultimate determination of disability or assessment of RFC must comport with a specific medical opinion." *Rubin*, 116 F.4th at 155. As the Second Circuit elaborated in *Curry v. Comm'r of Soc. Sec.*, an "ALJ [does] not draw medical conclusions; instead, and pursuant to his statutory

18

authority, the ALJ consider[s] the medical and other evidence in the record in its totality to reach an RFC determination." 855 Fed. App'x 46, 48 n.3 (2d Cir. 2021). Indeed, "[a]n RFC finding is administrative in nature, not medical, and its determination is within the province of the ALJ, as the Commissioner's regulations make clear." *Id.*

Second, Plaintiff asserts that the ALJ did not sufficiently address Plaintiff's lymphedema and obesity, as well as the side effects of Plaintiff's medications. (Pl. Br. at 16-22.) Plaintiff argues that the ALJ's decision did not give sufficient weight to evidence that Plaintiff had developed lymphedema prior to her DLI. (*See id.* at 16-17.) The evidence in the record does not suggest, however, that Plaintiff complained of lymphedema during the relevant period. (Tr. 216, 237-38, 243, 248-49, 254, 264, 277, 282, 287, 292, 297, 305.) While Plaintiff is correct that Dr. Mehara's 2018 letter states that Plaintiff's lymphedema developed "since" treatment, it appears that the letter is referencing Plaintiff's two reconstruction surgeries, both of which took place in 2017, outside of the relevant period. (Tr. 487 (referencing Plaintiff's lymphedema as having developed since her February 2017 implant and reduction surgery and November 2017 revision surgery).) Indeed, Plaintiff acknowledges that "the report where the lymphedema is noted is not until after the DLI and the treatment notes prior to the DLI make no discrete reference to [the lymphedema]." (Pl. Br. at 17.) As such, there seems to be little need to clarify, as Plaintiff requests, Dr. Mehara's statement that "[s]he is also [status-post] exchange to permanent implant and right breast reduction 2/2017 with revision of reconstruction with fat grafting 11/16/2017. She has since developed left upper extremity and torso lymphedema." (Tr. 487.) Since there is no dispute that the procedures took place outside of the relevant time period, the ALJ was under no obligation to give more weight to the lymphedema diagnosis. *See Perez*, 77 F.3d at 47 (finding that report written about present

19

condition over one year after date of disability onset did not contradict ALJ finding about Plaintiff's condition prior to date of onset).

Third, Plaintiff contends that, in not listing obesity as a "severe" impairment in the second decision despite including it in the first, the ALJ failed to acknowledge relevant evidence and may even have created an "RFC designed to deny." (Pl. Br. at 19-21.) Leaving aside Plaintiff's more inflammatory allegation,[4] Defendant correctly notes that "an ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." (Def. Br. at 22-23 (citing *Brault v. Soc. Sec. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).) Moreover, the ALJ acknowledged that Plaintiff had gained weight during her treatment, implying that he had indeed considered evidence of Plaintiff's obesity. (Tr. 694.) The ALJ also reviewed evidence that Plaintiff's doctors had suggested exercise such as walking and yoga to assist in controlling her weight. (Tr. 249.) Further, the ALJ's decision not to include obesity as a severe impairment is supported by evidence that Plaintiff's level of activity would still permit her to engage in light work, including treatment notes indicating that Plaintiff was walking up to a mile a day by December 2016. (Tr. 233.) As such, the ALJ adequately considered evidence of Plaintiff's obesity.

Finally, Plaintiff argues that the ALJ did not sufficiently consider the side effects of her medications. (Pl. Br. at 21-22.) Plaintiff asserts that, because there is nothing in the current opinion about Compazine, an anti-nausea medication, "we must assume that it was not considered." (*Id.* at 21.) As explained above, however, an ALJ is not required to detail each and every piece of evidence reviewed. *See Brault*, 683 F.3d at 448. Moreover, in his decision, the ALJ noted generally

---

[4] The prior ALJ decision was vacated on remand, and the ALJ then considered the issues *de novo*. As such, the ALJ was not required by the previous ALJ decision to include obesity as a severe impairment if the evidence did not substantiate that claim. *See Sabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010).

that Plaintiff had not mentioned side effects from medication during the time period at issue. (Tr. 693-94; *see* Tr. 233, 248, 297.) Accordingly, the ALJ's decision not to include medication side effects in the RFC is supported by substantial evidence.

Plaintiff's argument that the ALJ's decision was insufficiently articulated is, at its core, an attack on the substantiality of the evidence relied upon by the ALJ. Plaintiff asserts that the standard of articulation requires the ALJ to "build [a] logical bridge from the evidence to [his] conclusion to enable a meaningful review" and "simply explain the link between his RFC assessment and the record evidence supporting that assessment." (Pl. Br. at 24 (citing *Hickman v. Astrue*, 728 F. Supp. 168, 173 (N.D.N.Y. 2010); *Paul v. Colvin*, No. 15-cv-310, 2016 WL 6275231, at *2 (W.D.N.Y. Oct. 27, 2016)).) Plaintiff correctly cites the standard, and the Court finds that the ALJ met that standard. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) ("[a RFC finding] need only 'afford[] an adequate basis for meaningful judicial review, appl[y] the proper legal standards, and [be] supported by substantial evidence such that additional analysis would be unnecessary or superfluous[.]'" (citing *Cichoki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013))).

In sum, the ALJ's decision was supported by "more than a mere scintilla" of evidence. *Biestek*, 587 U.S. at 103. He reviewed Plaintiff's testimony about her limitations in lifting even relatively light objects, reaching, holding objects, climbing stairs, sitting or standing for periods of time, walking more than three blocks, experiencing anxiety and fatigue, and struggling with daily activities. (Tr. 693.) The ALJ found, after a sufficient review, that Plaintiff's assertions of extreme disability and severely restricted function were not consistent with the medical evidence submitted related to the period at issue. (Tr. 693-96.) The substantial evidence shows that Plaintiff's providers documented normal mental status throughout the relevant period, and Plaintiff did not seek out

specialized psychiatric assistance at any point during that period. (Tr. 966.) In addition, Plaintiff's physical examinations revealed normal findings, including a normal gait, normal reflexes, sensation, and muscle strength. (Tr. 243, 248-49, 254, 264, 272, 693-94.) By August 2016, Plaintiff reported performing all activities of daily living without symptoms or medication side effects. (Tr. 693-94.) For example, in December of 2016, Plaintiff described walking up to a mile per day. (Tr. 233.) Despite this evidence, the ALJ still considered her physical and mental incapacities, and ultimately determined that Plaintiff should be limited to unskilled light work with moderate limitations on interacting with others as well as maintaining concentration, persistence, or pace. (Tr. 696.)

Based on the above, this Court finds that a "reasonable mind might accept" the evidence "as adequate to support" the ALJ's determination. *Biestek*, 587 U.S. at 97. As such, this Court finds that the ALJ's decision was supported by substantial evidence.

## IV.    **CONCLUSION**

For the reasons set forth above, Plaintiff's motion for judgment on the pleadings is denied. The Commissioner's motion for judgment on the pleadings is granted.

**SO ORDERED.**

Brooklyn, New York
March 30, 2026

_Lara K. Eshkenazi_
LARA K. ESHKENAZI
United States Magistrate Judge

22